**INTERNATIONAL DETECTIVE SERVICE, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Brink's, Inc., Intervenor.**

No. 77–2113.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1978.

Decided March 14, 1979.

Rehearing Denied April 4, 1979.

Morris J. Levin, Washington, D. C., for petitioner.

David Popowski, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I. C. C., John J. Powers, III, Atty., Dept. of Justice, Robert B. Nicholson, and Daniel J. Conway, Attys., Dept. of Justice, Washington, D. C., were on brief, for respondents.

Chandler L. van Orman and Richard H. Streeter, Washington, D. C., were on brief, for intervenor.

Before TAMM, ROBINSON and MacKINNON, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

The petitioner, International Detective Service, Inc., (International) asks us to review the Interstate Commerce Commission's (Commission) grant of authority to Brink's, Inc. (Brink's) to operate as a contract carrier by motor vehicle, over irregular routes. This authority is limited to operations under a continuing contract or contracts with banks, financial institutions, and manufacturers or dealers in articles of unusual value, and allows Brink's to carry precious metals, including silver, coins, currency, and other articles of unusual value. We find that the Commission properly applied the relevant statutory requirements in approving the Brink's application, and that its conclusions are supported by substantial evidence. Accordingly, we affirm.

I

Brink's applied for a permit to operate as a contract carrier of precious metals [1] between any two of the following points: Bridgeport and Fairfield, Connecticut; Chicago, Illinois; Cambridge City, Union City, and Winchester, Indiana; Shreveport, Louisiana; Newark, New Jersey; New York, New York; Cincinnati and Dayton, Ohio; Tulsa, Oklahoma; Philadelphia, Pennsylvania; Laredo, Texas; Salt Lake City, Utah; Los Angeles County, California; and Essex, Middlesex, Union, and Winslow Counties, New Jersey,[2] restricted against transportation between any two of the following states: Connecticut, Massachusetts, Rhode Island, New Jersey, New York, and Pennsylvania. The application further restricted service to banks, financial institutions, and manufacturers of or dealers in articles of unusual value. International, a competitor of Brink's, protested the application.

A hearing was held before an administrative law judge (ALJ). Seven shippers testified in support of the application. The ALJ found their testimony insufficient evidence of shippers' transportation requirements and held that granting the authority would not be consistent with the public interest and the national transportation policy. Accordingly, he denied the application. Joint Appendix (J.A.) at 178. Brink's filed exceptions to the ALJ's decision, and the Commission (Division I) reversed. *Brink's, Inc., Extension—Precious Metals,* 128 M.C.C. 253 (1977).

The Commission's decision was premised on two separate findings. *See generally Midwest Truck Lines, Ltd. v. ICC,* 269 F.Supp. 554, 561 (D.D.C.1967) (three-judge

court). First the Commission ruled that the proposed service qualified as contract carriage under section 203(a)(15) of the Interstate Commerce Act (Act), 49 U.S.C. § 303(a)(15) (1970), *as amended by* Act of Oct. 17, 1978, Pub.L.No. 95–473 (to be codified in 49 U.S.C. § 10102(12))[3] because "applicant will . . . provide a highly specialized service for a limited class of persons or customers, which service is designed to meet the distinct needs of each individual customer[]." 128 M.C.C. at 260.

Second, the Commission considered whether approval of the Brink's application would meet the statutory criteria set forth in section 209(b) of the Interstate Commerce Act, 49 U.S.C. § 309(b) (1970), *as amended by* Act of Oct. 17, 1978, Pub.L.No. 95–473 (to be codified in 49 U.S.C. § 10923(b)) which, in pertinent part, provides:

In deciding whether to approve the application of a person for a permit as a motor contract carrier, the Commission shall consider—

(A) the number of shippers to be served by the carrier;

(B) the nature of the transportation proposed to be provided;

(C) the effect that granting the permit would have on the transportation of carriers protesting the granting of the permit; and

(D) the effect that denying the permit would have on the person applying for the permit, its shippers, or both, and the changing character of the requirements of those shippers.

The Commission considered each factor and determined that the application should be

---

**1.** The Commission defined precious metals as including silver, coins and currency, and other articles of unusual value. Brink's, Inc., Extension—Precious Metals, 128 M.C.C. 253, 262 (1977).

**2.** The application also included Providence, Rhode Island and Kellogg, Idaho. The Commission denied Brink's authority to operate between these cities because it found no need for service. *Id.* at 261 n.6.

Brink's filed another application to allow it to transport precious metal between Newark and

Carteret, New Jersey; Attleboro and Plainville, Massachusetts; and points in the contiguous forty-eight states. This application was granted by the administrative law judge, Joint Appendix (J.A.) at 178, and was not appealed to the Commission. 128 M.C.C. at 253 n.1.

**3.** The 1978 revisions in the language of the relevant sections do not enact substantive changes in the law. *See* Pub.L.No. 95–473, 92 Stat. 1337; H.Rep.No. 95–1395, 95th Cong., 2d Sess. 8–10 (1978).

granted to serve those shippers represented at the hearing, as well as the needs of a broader class of shippers, including banks and financial institutions. The Commission justified this grant because "[t]he seven supporting firms are representative of a broader class of shippers which require armored car service." 128 M.C.C. at 262.

■ International unsuccessfully sought reconsideration of the Commission's decision.[4] It then petitioned this court for review of the Commission's opinion and order.[5]

## II

As an initial matter, the Commission determined that the proposed Brink's service met the definition of "motor contract carrier" under section 203(a)(15) of the Act; that is, a person "other than a motor common carrier, providing motor vehicle transportation for compensation under continuing agreements with a person or a limited number of persons . . . designed to meet the distinct needs of each such person." 49 U.S.C. § 303(a)(15) (1970), *as amended by* Act of Oct. 17, 1978, Pub.L.No. 95–473 (to be codified in 49 U.S.C. § 10102(12)(B)). International attacks the Commission's conclusion on the ground that the grant of authority permits Brink's to serve more than a "limited" number of customers contrary to the explicit language of 203(a)(15).

■ International's contention is easily met.[6] A common carrier is obliged to serve the general public. A contract carrier, by comparison, need only provide service to one person or to a limited number of persons. *C–Line, Inc., Extension—Precious Jewelry,* 114 M.C.C. 226, 229–30 (1971), *aff'd C–Line, Inc. v. United States,* 376 F.Supp. 1043 (D.R.I.1974) (three-judge court). It is well settled that a carrier meets the statutory requirements of section 203(a)(15) if its proposed service, although available to a potentially limitless number of customers, is restricted by the precise needs of a class of customers. *Hudson Transit Lines, Inc. v. United States,* 562 F.2d 174, 181–82 (2d Cir. 1977); *Armored Motor Service Co., Conversion Proceeding,* 77 M.C.C. 433, 437–38 (1958).

■ The Commission found that the Brink's armored car service constitutes "a highly specialized service for a limited class of . . . customers." 128 M.C.C. at 260. The Commission's conclusion is supported by a long line of decisions classifying armored car service as contract carriage. *See Bankers Dispatch Corp. Conversion Application,* 110 M.C.C. 294, 305 (1969) (trans-

---

4. J.A. at 192. The Commission granted the Brink's motion to strike International's motion for reconsideration as not in compliance with 49 C.F.R. § 1100.97(d)(2) (1977), which sets out page limitations for petitions for reconsideration.

5. Brink's, Inc. appeared as an intervenor in support of the Commission.

In addition to the contentions discussed in Parts II and III *infra,* International also challenges the Commission's conclusion that granting the Brink's application was not a major federal action significantly affecting the quality of the human environment within the meaning of 42 U.S.C. § 4332 (1976). *See* 128 M.C.C. at 263. In determining whether an action is one that significantly affects the environment under 42 U.S.C. § 4332, the Commission will consider, as relevant here:

(1) The extent to which the action will cause environmental effects in excess of those created by existing use in the area affected by it;
(2) The absolute quantitative environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area.

49 C.F.R. § 1108.8(a) (1977). In light of International's failure to present any particular facts to support the position that the grant of authority would have a significant adverse impact on the environment, *see* J.A. at 1 (Protest—International Detective Service), and the pre-existing authorization of Brink's to operate similar service between some of the same cities, *see id.* at 101, we cannot say that the Commission's conclusion was erroneous. *See Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 553–54, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

6. For a scholarly exegesis of the history of congressional regulation of contract carriers, as well as an incisive analysis of section 203(a)(15), *see Hudson Transit Lines, Inc. v. United States,* 562 F.2d 174, 178–84 (2d Cir. 1977).

portation of cash letters for banks and banking institutions); *Armored Carrier Corp. Extension—Vermont,* 102 M.C.C. 411, 420–21 (1966) (same); *Armored Car Services, Inc., Common Carrier Application,* 82 M.C.C. 470, 472 (1960) (transportation of currency, coins, and checks between bank and department store); *Dunbar Armored Services, Inc., Extension—Washington,* 81 M.C.C. 710, 713 (1959) (transportation of bank bills, bonds, negotiable and nonnegotiable securities, notes, drafts, and other valuable papers, except cash letters and checks, for banks and banking institutions); *Armored Carrier Corp., Extension—Points in Three States,* 78 M.C.C. 191, 195 (1958) (transportation of commercial papers, documents, and written instruments, except currency, coin, bullion, and negotiable securities, for banks and banking institutions); *Armored Motor Services Co., Conversion Proceeding,* 77 M.C.C. at 434–35, 439 (transportation of money, securities, and other valuables among banks, retail stores, commercial businesses, and brokerage houses).

Brink's clearly offers specialized service to a limited class of customers with distinct needs. It will provide services specifically designed for customers who transport valuable commodities, including use of armored vehicles and armed guards. 128 M.C.C. at 256. Each shipper who testified before the ALJ stated that the Brink's armored service would satisfy its need for transportation of precious metal. International identified only one shipper, Sharps-Pixley, Inc., for whom it could allegedly provide equivalent service. The Commission's conclusion, on the basis of conflicting evidence, *see* text at —— of 194 U.S.App.D.C., at 868 of 595 F.2d *infra,* that Brink's would fill a distinct need for service, accords with section 203(a)(15) and the determination classifying the proposed service as contract carriage is therefore affirmed. *See ICC v. J–T Transport Co.,* 368 U.S. 81, 90–91, 93, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).

### III

■ The Commission, in order to approve the Brink's application, was also required to determine whether issuance of the permit would be consistent with the public interest. Specifically, section 209(b) of the Act commands the Commission to consider (1) the number of shippers to be served by the agreement, (2) the nature of the service proposed, (3) the effect which granting the permit would have upon the service of the protesting carrier, (4) the effect which denying the permit would have on the applicant, the supporting shippers, or both, and the changing character of those shippers' requirements. These factors are to be applied flexibly and not mathematically. *See Baggett Transportation Co. v. United States,* 231 F.Supp. 905, 907 (N.D.Ala.1964) (three-judge court) (criteria not to be considered "as though they were factors in an algebraic equation which might be solved mechanically").

The focus of the first factor is similar to the inquiry made by the Commission under section 203(a)(15). As we previously have explained, *see* text at ———— of 194 U.S.App.D.C., at 865–866 of 595 F.2d *supra,* the Commission found that the proposed service would serve the distinct needs of a limited number of shippers who desire armored car service. Thus, this criterion is met. *See Silica Sand Transport, Inc., Extension—LaSalle County, Ill.,* 119 M.C.C. 683, 687 (1974).

With regard to the second factor, the Commission stated that the Brink's service was designed to meet the needs of armored carrier customers in general, 128 M.C.C. at 256, as well as the particular needs of the individual shippers who appeared on behalf of the Brink's application. *Id.* at 260. International does not argue that the Brink's operation would fail to serve the needs of shippers who wish to use armored carriers. Brief for Petitioner at 36.

Next, the Commission considered the effect the grant of authority would have on International, the only protesting carrier. The Commission concluded that the proposed service would divert a "minimal" amount of traffic now carried by International between Chicago and New York, and that the diversion will not "materially ad-

versely affect International's operations." 128 M.C.C. at 261. International contests this conclusion by comparing its revenue from the Chicago-New York route from April 1, 1974 to March 31, 1975 ($63,800) [7] with its net income in 1974 ($19,274.24).[8] Because the total revenue for the Chicago-New York route exceeds the net income figure, International argues that it will be substantially harmed by the grant of authority allowing Brink's to provide Chicago-New York service.

International's contention is seriously defective. First, the comparative years, while overlapping, are not identical, thus making an analysis based upon them inaccurate. Second, the comparison of the Chicago-New York revenue, or *gross income,* to total *net income* does not necessarily demonstrate the effect the potential loss of business would have on International.[9] A probative comparison would have been between the *net income* derived from the Chicago-New York route and International's total *net income* for the year from April 1, 1974 to March 31, 1975. Finally, International's contention assumes, without evidentiary support, that the grant of authority to Brink's will divert all Chicago-New York traffic. In sum, we can find no basis on the record before us to disagree with the Commission's evaluation of this factor.

The Commission next concluded that denying the permit would deprive the shippers of the "specialized armored carrier services . . . which would be responsive to both their class and individual distinct needs." The Commission further found that several specific shippers, who relied on the earlier temporary authority of Brink's to serve their routes would be especially harmed. 128 M.C.C. at 261. A review of the relevant evidence sufficiently supports these conclusions.

1. *ASARCO, Inc.* transports silver bullion from Laredo, Texas, to Newark, New Jersey, and New York, New York. *Id.* at 257; J.A. at 119. ASARCO, Inc. believes that armored tractor-trailer delivery is essential for adequate protection of its bullion, and that Brink's would provide the needed security. *Id.* at 119–20. During the time in which Brink's held temporary authority for this route, ASARCO, Inc. used its services three times. *Id.* at 112–13.

2. *Automotive Products Division* transports platinum and palladium between Shreveport, Louisiana; Tulsa, Oklahoma; and Winslow, New Jersey. 128 M.C.C. at 257. Although Automotive Products Division did not utilize the Brink's service while Brink's had temporary authority to serve these routes, J.A. at 112–13, it stated that the complex procedures necessary to ship the metals made alternative methods of transportation uneconomical, and that Brink's is the only carrier able to meet its particular transportation requirements. *Id.* at 123–24.

3. *Engelhard Mineral and Chemicals Corp.* transports gold, silver, and platinum between points in northern New Jersey and Chicago, Illinois. 128 M.C.C. at 257–58. Although Engelhard did not use the Brink's temporary authority, J.A. at 112–13, a representative of Engelhard testified that it anticipated an increasing need for service, and that Brink's is the only carrier capable of meeting its particular demands. *Id.* at 142–43.

4. *Handy and Harman* transports silver and other precious metals between Salt Lake City, Utah; Fairfield, Connecticut; El Monte, California; and Chicago, Illinois. 128 M.C.C. at 258; J.A. at 145. The shipper testified that from January through July, 1974, it transported approximately 135,000 pounds of metals from Fairfield to El Monte; that those shipments were representative of its actual needs; [10] and that

---

**7.** International multiplied the twenty-nine shipments made during this period by $2,200, the flat rate charged for each trip. *See* J.A. at 70, 85.

**8.** *Id.* at 170.

**9.** International does maintain that long-haul, over-the-road movements are the most profitable. *See* Brief for Petitioner at 37.

**10.** Handy and Harman stated that the exact frequency, character, size, and value of shipments are confidential. J.A. at 146. The need

Brink's armored tractor-trailer service was necessary for transportation of its precious metals. *Id.* at 146–47.

5. *J. Aron & Co.* transports silver between Laredo, Texas; El Monte, California; Fairfield, Connecticut; Newark, New Jersey; New York, New York; Philadelphia, Pennsylvania; and Salt Lake City, Utah. 128 M.C.C. at 258. During the period in which Brink's held authority to operate armored service over these routes, J. Aron transported 32 shipments via Brink's. J.A. at 112–13.

6. *Sharps-Pixley Inc.,* a trader of precious metals, used International's service to move three truckloads of silver bullion from Chicago to the New York metropolitan area, 128 M.C.C. at 258, but testified that International did not sufficiently meet its needs. J.A. at 153–54. International disputed that conclusion. *Id.* at 68–74. Sharps-Pixley had not used Brink's to transport silver bullion from Chicago to New York. *Id.* at 112–13. Sharps-Pixley anticipates a need for armored car service between New York and Los Angeles. 128 M.C.C. at 258–59.

7. *Silvertown Coin Co.* ships gold and silver coin and bullion between three cities in Indiana—Winchester, Cambridge City, and Union City—and cities outside of Indiana—Bridgeport, Connecticut; Chicago, Illinois; Dayton and Cincinnati, Ohio; and New York City. *Id.* at 259. Silvertown transported two shipments pursuant to the Brink's temporary authority. J.A. at 112–13. The president of Silvertown testified

that the Brink's service would be more convenient and less expensive than alternate modes of transportation. *Id.* at 132–34.

The Commission also considered the changing character of the shippers' needs. 128 M.C.C. at 261. The evidence before the Commission supports the conclusions that Silvertown is developing a new distribution system, J.A. at 133; that Sharps-Pixley plans to expand its markets, *id.* at 152; and that, in general, the nature of the shippers' transportation needs, because of the structure of the precious metals market, is broad and unpredictable, *see id.* at 119 (ASARCO); 131, 134 (Silvertown); 143 (Englehard Mineral and Chemicals); 146 (Handy and Harman); 150–51 (Sharps-Pixley); 158 (J. Aron).

## IV

■ The Commission correctly classified Brink's as a contract carrier and, after carefully weighing the four relevant factors, properly found that the grant of authority was consistent with the public interest.[11] The Commission's decision is supported by substantial evidence on the record, and its authorization of service is therefore

*Affirmed.*

---

for confidentiality concerning the shipment of precious metals was emphasized by other shippers. *See id.* at 125 (Automotive Products Division); 141 (Engelhard); 158 (J. Aron). Handy and Harmon had used the Brink's service in the past, J.A. at 112, apparently in accordance with an unpublished Commission order. *See* Brief for Respondent at 34.

11. International also challenges the Commission's conclusion that Brink's is fit to perform as a contract carrier pursuant to section 209(b) of the Interstate Commerce Act, 49 U.S.C. § 309(b) (1970), *as amended by* Act of Oct. 17, 1978, Pub.L.No. 95–473 (to be codified in 49 U.S.C. § 10923(b)). *See* 128 M.C.C. at 262. International's challenge alleges that Brink's

has been involved in antitrust proceedings and has carried some shipments without Commission approval. Brief for Petitioner at 43–44. The first argument is not presented to the Commission, *see id.* at 44 n.39; note 4 *supra,* and will not be considered by this court. *See EDF v. EPA,* —— U.S.App.D.C. —— at ——, 598 F.2d 62 at 91 (1978). Even if Brink's did, as alleged, engage in unauthorized operations, such actions would not necessarily mandate a reversal of the Commission's expert judgment. *See Crete Carrier Corp. v. United States,* 577 F.2d 49, 51 (8th Cir. 1978); *Armored Carrier Corp. v. United States,* 260 F.Supp. 612, 614–15 (E.D.N.Y.1966), *aff'd per curiam,* 386 U.S. 778, 87 S.Ct. 1476, 18 L.Ed.2d 524 (1967).